UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| RAQUEL HARO,<br><br>        Plaintiff,<br><br>        v.<br><br>COUNTY OF PORTER INDIANA, a municipal entity, PORTER COUNTY SHERIFF'S DEPARTMENT, a municipal entity, and DARROLYN S. BRADLEY, individually and in her official capacity as a Porter County Jail Correctional Officer,<br><br>        Defendants. | CAUSE NO.: 2:21-CV-131-TLS |

**OPINION AND ORDER**

This matter is before the Court on the Defendant's Motion for Summary Judgment [ECF No. 20]. The Motion for Summary Judgment is fully briefed. For the reasons set forth below, the Court grants the Motion.

**PROCEDURAL BACKGROUND**

The Plaintiff filed a Complaint [ECF No. 1] against the Defendants on April 16, 2021. The Plaintiff claims that the Defendants subjected her to an unlawful search in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Compl. ¶ 39. She claims that Defendants Porter County and Porter County Sheriff's Department authorized, tolerated, ratified, permitted, or acquiesced in official policies and practices that subjected female arrestees to unlawfully intrusive strip and visual body cavity searches. *Id.*

The Defendants filed their Answer [ECF No. 10] on July 6, 2021, and the parties completed discovery on May 16, 2022, *see* ECF No. 12. On August 30, 2022, the Defendants

filed the instant Motion for Summary Judgment. The Plaintiff responded on September 28, 2022 [ECF No. 23], and the Defendants replied on October 13, 2022 [ECF No. 30].

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of his case on which he bears the burden of proof; if he fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**MATERIAL FACTS[1]**

On April 28, 2019, the Plaintiff lived in a duplex apartment in Valparaiso, Indiana, with Glenndon Bone and Yajaira Navarro. Ex. A at 30:20–25, 31:4–6, 15–18; Ex. B. Bone was a member of a fraternity and invited new inductees to the apartment to celebrate the inductees' recent induction. Ex. A at 30:21–23. Sometime after midnight, the police arrived and knocked on the door because a neighbor had made a noise complaint. *Id.* at 32:1–11. At the time, the Plaintiff was in the kitchen making sugar cookies and had consumed two cups of Crown Royal mixed with cranberry juice but had consumed no drugs. *Id.* at 32:20–33:9, 35:22–25.

The police asked which of the attendees were on the lease, and the Plaintiff acknowledged that she was on the lease. *Id.* at 33:14–19. Erick Pickford, of the Valparaiso Police Department, determined that he had probable cause to arrest the Plaintiff for furnishing alcohol to a minor because eight minors were receiving alcohol at the party and the Plaintiff lived at the apartment. *See* Ex. B. An officer told the Plaintiff and her roommates that they were going to be able to bond themselves out and escorted each roommate upstairs to retrieve identification and a sweater. Ex. A at 33:22–34:2. Before she got her sweater, the Plaintiff was wearing light blue jeans, a light pink bodysuit, undergarments, socks, and shoes. *Id.* at 34:3–7.

Pickford transported the Plaintiff to the Porter County Jail and led her into the booking area for processing. *Id.* at 36:20–24, 37:21–38:3. According to the Porter County Jail inmate file for the Plaintiff, the Plaintiff arrived at the Porter County Jail at 2:26 am. Ex. C. The Plaintiff was directed to sit on a bench in the booking area, where she sat for no more than five minutes. Ex. A at 42:5–11. A male officer standing in a doorway called the Plaintiff's name and motioned

---

[1] The facts are taken from Plaintiff's Response to Defendants' Statement of Material Facts [ECF No. 24] and Defendants' Response to Plaintiff's Statement of Additional Material Facts [ECF No. 31]. Exhibits A–P are docketed at ECF Nos. 22-1–22-16, and Exhibits 1–11 are docketed at ECF Nos. 25-1–25-11.

for her to go over to a door where a Soter RS body scanner was, and the officer directed the Plaintiff to get in position behind the body scanner. *Id.* at 42:20–24, 43:2–5.

The Plaintiff did not recall being asked pre-scanning questions but agreed that she accepted going through the body scanner and that she signed the statement asking if she was pregnant, if she was in a wheelchair, and whether she had a pacemaker or had undergone radiation or chemotherapy in the past six months. Ex. A at 43:6–44:7; Ex. C at 3. The Plaintiff alleges that she asked the officer conducting the scan what the machine was and that he informed her it was a body scanner. Ex. A at 44:8–15. The Plaintiff denied that the officer asked her whether she had anything on her body that would show up on the scan, and she did not recall whether the officer asked any questions during or after the scan. *Id.* at 45:3–12, 45:16–20.

After the officer conducted the scan, he told the Plaintiff to go sit down, and the Plaintiff did not see what the officer did after that. *Id.* at 46:17–25. The Plaintiff did not know whether the officer went to talk to Defendant Bradley, what conversation the officer may have had with Defendant Bradley after the scan, or what Defendant Bradley may have said to the officer. *Id.* at 47:1–9.

The Soter body scanner was new to the Porter County Jail in April 2019. Ex. 1 at 22:7–13, 68:5–10. The machine could detect metal under clothes. *Id.* at 22:7–10. Objects that are denser than human tissue appear darker on a body scan image, and objects that are less dense than human tissue appear lighter on the scan. Ex. 8 at 15:5–9. Objects of higher density appear darker than objects of lower density. *Id.* at 27:16–20. The Soter body scanner differentiates densities, so narcotics, which are a different density than human tissue, can be seen, and something like a metal item, which is a higher density than human tissue, can be seen. *Id.* at 17:9–18.

4

After a person is scanned, the monitor controlled by the operator displays the scanned image. Ex. 1 at 85:21–86:2. The monitor can be used similarly to a cell phone screen: the operator can use fingers on the touchscreen to enlarge or turn whatever is on the screen. *Id.* at 86:7–9; Ex. 8 at 13:16–18. The operator can also use a keyboard and mouse. Ex. 8 at 13:18–21.

Porter County written policy permitted strip searches upon intake only if there is reasonable suspicion that the arrestee is or may be carrying or concealing contraband or criminal evidence. Ex. 1 at 46:1–12; Ex. F at 4–5. The Porter County Sheriff's Department Standard Operating Procedures state that "Jail Officers shall restrict the use of strip searches depending on a[n] inmate's conduct, current charges, conviction history and at what point they are in the custody process." Ex. F at 4. Regarding an inmate's conduct, if an officer had reasonable suspicion that a particular person was attempting to smuggle drugs into the jail or consume them, that would provide justification to do a strip search. Ex. I at 45:4–16.

The Plaintiff testified that this was the first time she had ever been arrested. Ex. 2 at 30:12–19. The Plaintiff's charges did not meet the Porter County Jail criteria for justifying a strip search. Ex. 3 at 34:15–35:6. The Porter County Jail did not have a blanket policy requiring strip searches of all arrestees. Ex. 4 at 37:11–14. Sergeant Watkins testified that furnishing alcohol to a minor is not the type of charge that would provide reasonable suspicion that a person was concealing drugs. Ex. 1 at 46:22–47:7, 111:20–24.

Sergeant Watkins knew that the Soter body scanner could detect buttons and snaps on clothes. Ex. 1 at 82:15–18, 83:19–21, 106:3–5. He knew that women wear body suits that snap between the legs. *Id.* at 117:22–118:2. He testified that metal snaps that are sideways would be seen on a body scan image. Ex. 1 at 102:21–24. They would show up as more dense than human tissue on a scan. Ex. 8 at 25:9–18. A pill would appear darker than human tissue but as a different, lighter shade than metal. *Id.* at 28:2–9. Other than a pill, Sergeant Watkins could not

think of anything else that might look like a button positioned sideways. Ex. 1 at 102:25–103:5. After the body scan, there was no reason to believe that the Plaintiff was concealing a weapon. Ex. 4 at 34:17–23.

However, Sergeant Watkins testified that a darkened area that showed up on the Plaintiff's body scan in her pelvic region "looked like [a] pill with the baggie or something, another object on the outside of it concealing it." Ex. I at 104:21–105:2. He also testified that he has had experiences with the body scanner where what showed up on the scanner was a piece of clothing, but the person being searched could have put the contraband there knowing the piece of clothing would be covering the contraband. *Id.* at 108:5–109:10. The Plaintiff testified that the darkened area in her pelvic region, which showed up on the body scan, consisted of buttons from the bodysuit she was wearing. Ex. A at 48:2–15; *see* Ex. D (body scan image).

Sergeant Watkins ordered a strip search to be performed by Defendant Bradley. Ex. 9 ¶ 2. Sergeant Watkins testified that it would have been his practice to ask the Plaintiff if she had any metal or anything in her pelvic region or in her groin area. Ex. 1 at 115:16–21. He testified that had the Plaintiff answered that she had metal snaps, he would have asked Defendant Bradley to verify their existence and would not have ordered a strip search. *Id.* at 115:16–116:6.

Defendant Bradley testified that she believed she saw the Plaintiff's body scan image before conducting the strip search. Ex. 4 at 25:3–25. When shown the body scan during her deposition, Defendant Bradley denied knowing what the anomaly on the body scan was. *Id.* at 31:7–10. Defendant Bradley knew that the body scanner would detect metal underneath clothing. *Id.* at 26:12–14, 35:24–36:2.

Defendant Bradley knew that some bodysuits snap between the legs, *id.* at 12:6–13, and she knew that bodysuits normally have two buttons, *id.* at 20:2–13. When shown the dark area on

the Plaintiff's body scan at her deposition, Defendant Bradley testified that the dark area could be anything. *Id.* at 29:25–30:8, 46:14–15.

Soon after the Plaintiff finished the body scan and resumed her place on the bench, Defendant Bradley called the Plaintiff's name and motioned for her to come to a doorway she was standing in, directly in front of the bench. Ex. A at 50:7–14. The room the Plaintiff entered was a long, rectangular shaped room with showers, and only the Plaintiff and Defendant Bradley were inside. *Id.* at 50:15–51:2.

Defendant Bradley directed the Plaintiff to stand in front of the shower, in front of a half wall, and take off each piece of her clothing one by one, which would go in the Plaintiff's property tote, and the Plaintiff responded "okay" and did not ask any questions. *Id.* at 51:3–18. The Plaintiff told Defendant Bradley that she would need to take her pants off before her bodysuit, and Defendant Bradley responded "okay." *Id.* at 51:19–25; ECF No. 24-1 ¶ 10. Defendant Bradley testified that in 2019, if the Plaintiff had told her that, she would have known that body suits have metal snaps in between the legs. Ex. 4 at 35:16–23. After learning that the Plaintiff was wearing a bodysuit with metal snaps, Defendant Bradley did not stop the strip search. ECF No. 24-1 ¶ 15.

Once the Plaintiff was naked, Defendant Bradley instructed the Plaintiff to turn and face the shower, bend over, and spread her butt cheeks. Ex. A at 52:1–8; ECF No. 24-1 ¶ 16; Ex. 4 at 20:21–21:4. The Plaintiff complied without saying anything. Ex. A at 52:7–12. Defendant Bradley was looking into the Plaintiff's body cavities when the Plaintiff was bent over. Ex. 4 at 21:15–18.

The Plaintiff did not know what instructions Defendant Bradley received prior to taking the Plaintiff into the shower. Ex. A at 52:13–15. The entire process of the Plaintiff walking into the shower room, removing her clothing, and having to bend over took five to ten minutes, and

7

she was bent over for 10 to 20 seconds. *Id.* at 52:16–22. Defendant Bradley never put her hands on the Plaintiff during the process. *Id.* at 52:23–25.

Defendant Bradley instructed the Plaintiff to shower, which lasted one or two minutes before the water shut off. *Id.* at 53:1–20. When the water stopped, Defendant Bradley supplied the Plaintiff with the inmate uniform, which she put on, Defendant Bradley grabbed the property tote with the Plaintiff's clothes, and she told the Plaintiff to follow. *Id.* at 53:21–54:12. Defendant Bradley then took the Plaintiff to a cell where two women were already occupying the beds, and ultimately Defendant Bradley provided a "boat," or plastic tray, to sleep on, a blanket, and a mat. *Id.* at 54:9–20.

Defendant Bradley returned and took the Plaintiff to another holding cell where she was reunited with other girls from the party, Teri Easter, Trivianna Harden, and Kate Locher. *Id.* at 57:1–17. The females from the party in that cell were discussing what happened to them at the jail, and Easter said she had been through the same procedure as the Plaintiff. *Id.* at 58:2–17. According to the Plaintiff, none of the males were strip searched. *Id.* at 64:8–10. Ultimately, Defendant Bradley was the officer who removed the Plaintiff from the cell when she bonded out at 6:05 a.m. *Id.* at 66:4–6; Ex. C at 8. The Plaintiff never asked Defendant Bradley any questions about why she had to be strip searched. Ex. A at 66:16–18.

**ANALYSIS**

A.     **Reasonableness of the Search**

The Plaintiff claims that Defendant Bradley subjected the Plaintiff to an unlawful and intrusive search with no legal justification in violation of the Plaintiff's Fourth and Fourteenth Amendment rights. Determining whether a search was reasonable under the Fourth Amendment "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). "Courts must consider the

8

scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

The Seventh Circuit has recognized that "[a] detention facility is a unique place fraught with serious security dangers, and officials have a legitimate and substantial need to prevent arrestees from bringing weapons or contraband into such a facility." *Kraushaar v. Flanigan*, 45 F.3d 1040, 1045 (7th Cir. 1995) (quoting *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1273 (7th Cir. 1983)) (cleaned up). Nonetheless, courts must balance that need with "the fact that strip searches involving visual inspection of the genital areas are 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Id.* (quoting *Mary Beth G.*, 723 F.2d at 1272).

The Seventh Circuit has held that a strip search is unreasonable unless there is a danger of the suspect concealing weapons or contraband. *See Mary Beth G.*, 723 F.2d at 1273 ("[E]nsuring the security needs of the City by strip searching plaintiffs-appellees was unreasonable without a reasonable suspicion by the authorities that either of the twin dangers of concealing weapons or contraband existed." (citing *Doe v. Renfrow*, 631 F.2d 91, 93 (7th Cir. 1980))); *King v. Shieferdecker*, No. 8-3213, 2011 WL 2636826, at *5 (C.D. Ill. July 6, 2011) ("Strip searches of arrestees can be conducted only if there is reasonable suspicion that the arrestee is concealing weapons or contraband." (citing *Campbell v. Miller*, 499 F.3d 711, 717 (7th Cir. 2007), *Mary Beth G.*, 723 F.2d at 1273)); *United States v. Logan*, 219 F. App'x 533, 535 (7th Cir. 2007) ("[J]ail officials . . . must have a particularized suspicion that the arrestee is harboring contraband on his body before conducting a strip search." (cleaned up)). A "particularized suspicion may arise from such factors as the nature of the offense, the arrestee's appearance and conduct, and the prior arrest record." *Logan*, 219 F. App'x at 535 (cleaned up) (citations omitted); *see United States v. Jones*, 341 F. App'x 176, 178 (7th Cir. 2009).

In *Brown v. Polk County*, the Seventh Circuit found that a strip search was justified by reasonable suspicion because officers had received tips that the person to be searched was hiding methamphetamine in a body cavity. 965 F.3d 534, 536, 540 (7th Cir. 2020). The court explained that "a credible tip from a reliable informant can support reasonable suspicion." *Id.* at 540 (citing *Adams v. Williams*, 407 U.S. 143, 146–47 (1972)). In *United States v. Freeman*, the Seventh Circuit held that a strip search was justified because of the suspect's criminal history, arrest related to drug trafficking, and uncomfortable fidgeting in his seat while awaiting booking. 691 F.3d 893, 896 (7th Cir. 2012).

The Seventh Circuit's opinion in *Kraushaar* provides a helpful analogy for determining reasonable suspicion. There, police arrested a driver for driving under the influence, at which point an officer noticed the driver making motions around his waistband. 45 F.3d at 1043. The police ordered a strip search of the driver once they got to the station, and the driver subsequently sued the police for an illegal strip search. *Id.* at 1044. The Seventh Circuit concluded that the strip search was justified by reasonable suspicion because the driver had been arrested for driving under the influence, and the arresting officer believed that the driver had put something down his pants. *Id.* at 1045–46. The Seventh Circuit also stated that "[a]lthough there was strong evidence of alcohol intoxication . . . , that does not rule out the possibility of impairment by drugs as well." *Id.* at 1046.

Here, police arrested the Plaintiff for furnishing alcohol to minors at a party. Following the arrest, officers had the Plaintiff go through a body scanner. Sergeant Watkins viewed the resulting scan, which included a darkened area in the Plaintiff's pelvic region. In other words, the scan showed Sergeant Watkins that the Plaintiff had something other than human tissue in her pelvic region.

The Seventh Circuit found that the officers in *Kraushaar* had reasonable suspicion to conduct a strip search because the arresting officer based solely on a *belief* the driver had put something down his pants, *id.* at 1045–46, but here Sergeant Watkins could identify, through the body scan image, an object in the Plaintiff's pelvic region that was not human tissue. The Seventh Circuit's reasoning in *Kraushaar* supports a finding that the body scan image in this case was sufficient to create reasonable suspicion for a strip search. In fact, it suggests that the Defendants could have opened themselves up to negligence charges had they not conducted a search. *See id.* at 1046 ("[I]f [the officer] had not conducted a search based upon this knowledge, he would have been open to negligence charges if [the driver] had in fact concealed a weapon or contraband in his pants and that item ultimately caused a death or injury inside the jail.").

The Plaintiff argues that she had no prior arrest record and that the nature of her offense is not commonly associated with the possession of weapons, drugs, or contraband. However, while the absence or presence of a prior arrest record should be accounted for when deciding if there is reasonable suspicion for a strip search, *see Logan*, 219 F. App'x at 535, *Kraushaar* demonstrates that a prior arrest record is not necessary to a finding of reasonable suspicion. In *Kraushaar*, there is no evidence as to whether the driver had a prior arrest record, yet the Seventh Circuit nonetheless found that the officers had reasonable suspicion to conduct a strip search. 45 F.3d at 1045–46.

The Plaintiff points to *Logan v. Shealy*, 660 F.2d 1007 (4th Cir. 1981), a Fourth Circuit case from 1981, to support her argument that the nature of her offense—furnishing alcohol to minors—bears no relation to the possession of weapons, drugs, or contraband. In *Logan*, police arrested a woman suspected of driving under the influence of alcohol and subjected her to a strip search pursuant to a policy of strip searching all persons held at the detention center, regardless of their offense. 660 F.2d at 1009–10. The Fourth Circuit held that "[the woman's] offense,

11

though not a minor traffic offense, was . . . not commonly associated by its very nature with possession of weapons or contraband." *Id.* at 1013. The court also held, however, that "there was no cause in her specific case to believe that she might possess either [weapons or contraband]." *Id.* The cause absent from *Logan* is present here; namely, the body scan image showing non-human tissue in the Plaintiff's pelvic region. Here, the Plaintiff's arrest "was coupled with specific [facts]" that supplied reasonable suspicion for a strip search. *Kraushaar*, 45 F.3d at 1046 (distinguishing *Logan v. Shealy* because *Logan* did not include "any additional factor that would suggest that the . . . arrestee might possess contraband").

The Court also finds *Pierce v. County* persuasive, a case in which body scan images supplied reasonable suspicion for a body cavity search. No. 21-C-354, 2022 WL 16798540 (E.D. Wis. Nov. 8, 2022). In *Pierce*, an arrestee turned herself in after becoming aware of outstanding warrants for her arrest. *Id.* at *1. Jail staff had her go through an electronic body scan as part of the jail's routine booking process. *Id.* The "staff who viewed the image from [the arrestee's] body scan determined that a shadow appeared in her pelvic region, suggesting the possible presence of contraband," and they subsequently authorized a body cavity search. *Id.* The court eventually concluded that the jail staff had reasonable suspicion to authorize the body cavity search. *Id.* at *3. It reasoned as follows:

> Body scans were apparently a routine part of the WCJ booking process relied upon by WCJ staff in the determination of whether to accept an inmate into the jail. Information of this nature is sufficient to establish reasonable suspicion that an inmate is concealing something inside her body. Unlike tips provided by a couple of inmates, an electronic scanning device operated by the staff of another detention facility is likely to be more objective and not subject to the pressures and incentives that can lead to false accusations in a prison setting.

*Id.* The Court finds the reasoning in *Pierce* equally applicable here and concludes that the body scan of the Plaintiff was sufficient to establish reasonable suspicion that the Plaintiff may have been concealing contraband.

12

**B.     Scope of the Search**

"That the defendants met the requisite level of individualized suspicion is just one component of the search's reasonableness." *Brown*, 965 F.3d at 540. The Court must also "consider the scope of the search, the manner in which it was conducted, and the place in which it occurred." *Id.* (citing *Bell*, 441 U.S. at 559).

*1.     Whether Defendant Bradley Could have Used Less Intrusive Means*

The Plaintiff argues that Sergeant Watkins should have asked whether the Plaintiff had anything metal near her groin area. Sergeant Watkins testified that it would have been his practice to ask the Plaintiff if she had any metal or anything in her pelvic region. The Plaintiff, however, denied that the officer conducting the scan asked her whether she had anything on her body that would show up on the scan and did not recall whether the officer asked any questions during or after the scan. For the purposes of summary judgment, the Court assumes that Sergeant Watkins did not ask the Plaintiff whether she had anything metal near her groin area. The Court must determine whether Sergeant Watkins' failure to ask led to an unreasonable search.

The Plaintiff contends that the failure to ask makes the search unreasonable because asking was the least intrusive means reasonably available to verify or dispel the officer's suspicion. The Supreme Court has stated, regarding a seizure justified on the basis of a reasonable suspicion, that "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also Brown v. Polk County*, 141 S. Ct. 1304, 1305–06 (2021) (Sotomayor, J., respecting denial of certiorari) (citing *Royer*, 460 U.S. at 500). However, Supreme Court precedent also suggests that courts should consider the effectiveness of the search methods available and the barriers raised by "elaborate less-restrictive-alternative arguments." *See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536

U.S. 822, 837 ("[T]his Court has repeatedly stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means, because '[t]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.'" (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 556 n.12 (1976))); *Bell*, 441 U.S. at 559 n.40 ("However, assuming that the existence of less intrusive alternatives is relevant to the determination of the reasonableness of the particular search method at issue, the alternative suggested by the District Court simply would not be as effective as the visual inspection procedure.").

The Plaintiff argues that Sergeant Watkins should have asked whether she had anything metal in her pelvic region. The Court does not consider the Plaintiff's suggestion to be an "elaborate less-restrictive-alternative argument." *Earls*, 536 U.S. at 837. Nonetheless, the Court does find that asking would have been less effective and an unreasonable method of dispelling Sergeant Watkins' suspicion that the Plaintiff was concealing contraband.

Sergeant Watkins' suspicion that the Plaintiff was concealing something arose after he viewed the image produced by the Plaintiff's body scan, which showed a darkened area in the Plaintiff's pelvic region. Sergeant Watkins testified that the darkened area "looked like [a] pill with the baggie or something, another object on the outside of it concealing it." Ex. I at 104:21–105:2. He also testified that he has had experiences with the body scanner where what showed up on the scanner was a piece of clothing, but the person being searched could have put the contraband there knowing the piece of clothing would be covering the contraband.

Had Sergeant Watkins asked if the Plaintiff had any metal in her pelvic region, he may have been told that the Plaintiff was wearing a body suit with snaps. However, Sergeant Watkins' experience led him to believe the darkened area on the Plaintiff's body scan image looked like a pill within a bag, and he knew subjects may hide contraband behind clothing.

Asking the subject of a body scan to reveal whether there is metal in their pelvic region is unlikely to be an effective or reasonable means of determining whether the subject is concealing a pill or other contraband, on its own, in a bag, or behind clothing such as the snaps of a body suit.

2.  *Whether Defendant Bradley Should Have Stopped the Strip Search*

The Plaintiff argues that once the Plaintiff told Defendant Bradley she was wearing a bodysuit, given Defendant Bradley's knowledge about bodysuits, Defendant Bradley should have understood that the dark spot on the Plaintiff's body scan was an image of the bodysuit's metal snaps and she should have stopped the search.

To support her argument, the Plaintiff cites cases standing for the proposition that the Fourth Amendment requires the scope of a search to be limited by the initial justification for the search. *See Maryland v. Garrison*, 480 U.S. 79, 87 (1987) ("[T]he purposes justifying a police search strictly limit the permissible extent of the search . . . ."); *Terry v. Ohio*, 392 U.S. 1, 29 (1968) ("Thus, evidence may not be introduced if it was discovered by means of a seizure and search which were not reasonably related in scope to the justification for their initiation."); *Royer*, 460 U.S. at 500 ("The [Fourth] Amendment's protection is not diluted in those situations where it has been determined that legitimate law enforcement interests justify a warrantless search: the search must be limited in scope to that which is justified by the particular purposes served by the exception."). None of the three cases cited by the Plaintiff apply that rule in the context of an arrestee searched for contraband at a jail intake, and the Plaintiff has not cited any case that does.[2] *See Garrison*, 480 U.S. at 80 (police searched an apartment for

---

[2] The Plaintiff concedes she "has not found a case on all fours involving a correctional officer who failed to terminate a strip search after reasonable suspicion had been dispelled," and "the factual circumstances of this case may be novel." Pl.'s Resp. Br. 25, ECF No. 23.

contraband pursuant to a warrant); *Terry*, 392 U.S. at 5–7 (police stopped three men on the street and patted down the outside of their clothing to check for weapons); *Royer*, 460 U.S at 493–95 (narcotics investigators pulled aside a suspect at an airport and searched his suitcases for drugs).

Notwithstanding the lack of precedent applying the Plaintiff's rule to the instant context, Defendant Bradley's decision to continue the strip search after learning the Plaintiff was wearing a bodysuit does not run afoul of the idea that searches should be limited in scope by the initial justification for the search. Sergeant Watkins identified the dark spot on the Plaintiff's body scan and ordered that Defendant Bradley conduct the strip search. Defendant Bradley testified that she believed she saw the Plaintiff's body scan image before conducting the strip search. When shown the body scan during her deposition, Defendant Bradley denied knowing what the dark spot on the body scan was. Thus, to identify the source of a dark spot on the Plaintiff's body scan viewed by both her and Sergeant Watkins, Defendant Bradley conducted the strip search.

It is possible that when the Plaintiff told Defendant Bradley she was wearing a bodysuit, Defendant Bradley could have realized that some bodysuits have metal snaps between the legs, assumed that the Plaintiff's bodysuit included metal snaps, and deduced that the snaps on the Plaintiff's bodysuit may have been the anomaly that appeared on the Plaintiff's body scan. However, on summary judgment the Plaintiff is entitled to have reasonable inferences drawn in her favor, and it is not a reasonable inference that Defendant Bradley guessed the Plaintiff's bodysuit had metal snaps and subsequently correlated the metal snaps with the dark spot on the body scan.

Further, the fact that the snaps on the Plaintiff's bodysuit could be the source of the dark spot on the body scan would not necessitate the conclusion that the snaps were in fact the source of the dark spot. When shown the body scan during her deposition, Defendant Bradley denied knowing what the dark spot on the body scan was. Sergeant Watkins, who ordered the strip

search, testified that the dark spot looked like a pill within a bag. He also testified that body scan subjects may conceal contraband behind clothing. Accordingly, it was not unreasonable for Defendant Bradley to continue the strip search after learning that the Plaintiff was wearing a bodysuit. Having determined that both the justification and the scope of the Plaintiff's search were reasonable based on the evidence of record, the Court finds that Defendant Bradley is entitled to summary judgment on the Plaintiff's Fourth Amendment unlawful search claim.

C.     **Qualified Immunity**

Defendant Bradley argues that she is entitled to qualified immunity. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). Thus, the two questions are "whether the plaintiff has alleged a deprivation of a constitutional right at all, and whether the right at issue was clearly established at the time and under the circumstances presented." *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016) (citation omitted). Because the Plaintiff has failed to create a genuine dispute of material fact as to the alleged constitutional violation, the Court need not further address the issue of qualified immunity. *See Los Angeles County v. Rettele*, 550 U.S. 609, 616 (2007); *Tucker v. Williams*, 682 F.3d 654, 660 (7th Cir. 2012) ("Because we do not find a constitutional violation, we need not and do not address Williams' qualified immunity defense.").

D.     **Defendants Porter County and Porter County Sheriff's Department**

The Defendants argue that Porter County is entitled to judgment as a matter of law because it does not control the actions of the Sheriff's Department in the operation of the Porter County Jail. The Defendants also argue that the Plaintiff cannot establish that a practice, policy, or custom of the Sheriff's Department was the moving force behind the strip search. Both

arguments are related to the issue of municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The Court need not address these arguments because the Plaintiff has failed to establish a constitutional violation.

In *Monell*, the Supreme Court decided that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents," but that a local government entity is responsible under § 1983 "when execution of a government's policy or custom . . . inflicts the injury." 436 U.S. at 694. Thus, a local government entity may be liable for the constitutional violations of its employees or agents if the entity's policy or custom led to the constitutional violation. *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 306 (7th Cir. 2010) ("*Monell* recognized that the premise behind a § 1983 action against a government body is 'the allegation that official policy is *responsible* for the deprivation of rights.'" (quoting *Monell,* 436 U.S. at 690)).

Preliminarily, however, the Plaintiff must show a constitutional violation. Absent a constitutional violation on the part of Defendant Bradley, the Plaintiff cannot establish a constitutional violation on the part of Defendants Porter County or Porter County Sheriff's Department. *See Monell*, 436 U.S. at 690–91 ("[L]ocal governments . . . may be sued for *constitutional deprivations* . . . ." (emphasis added)); *Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) ("If the plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants, there will be no viable *Monell* claim based on the same allegations." (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986))). Accordingly, the Court grants summary judgment on the claims brought against Defendants Porter County and the Porter County Sheriff's Department.

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS the Defendants' Motion for Summary Judgment [ECF No. 20]. The Court DIRECTS the Clerk of Court to enter judgment against the Plaintiff Raquel Haro and in favor of the Defendants Darrolyn S. Bradley, Porter County, and the Porter County Sheriff's Department.

SO ORDERED on September 29, 2023.

                                            s/ Theresa L. Springmann
                                            JUDGE THERESA L. SPRINGMANN
                                            UNITED STATES DISTRICT COURT